UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:20-cr-00204-GMN-EJY |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| XZAVIONE TAYLOR, | **Re: Motion to Suppress (ECF No. 14)** |
| Defendant. | |

Before the Court, on referral from District Judge Gloria M. Navarro, is Defendant Xzavione Taylor's Motion to Suppress (ECF No. 14). The Court has reviewed Defendant's Motion, the Government's Response in Opposition to Defendant's Motion (ECF No. 20), and Defendant's Reply to the Government's Response (ECF No. 26). The Court held an evidentiary hearing on November 30, 2020, and heard closing arguments on December 1, 2020.

## I.    Background Facts

The facts in this case are largely undisputed and many are captured on body cameras worn by two Las Vegas Metropolitan Police Department ("LVMPD") officers.

In the early evening of July 10, 2020, when it was still light outside, LVMPD uniformed Officers Gariano ("Gariano") and Alvarado ("Alvarado") stopped Defendant (using lights and siren) near Van Buren Avenue and Marion Drive because Defendant was driving a vehicle without a license plate or temporary tag indicating that the car was registered with the Department of Motor Vehicles ("DMV"). Gariano, the lead officer in the case, testified that Defendant was stopped in a high crime area of the Las Vegas valley. To support this statement, Gariano explained that he has been a law enforcement officer with the LVMPD for five years, and assigned to the Northeast Area Command "Flex" unit for the last four years. Gariano stated that the "Flex" unit is a proactive squad that attempts to suppress violent crime. As a member of the Flex unit, Gariano is in the Northeast Area of Las Vegas on every shift. He may receive daily, weekly or sometimes hourly briefings on crimes committed or areas to target to prevent crimes. Gariano stated that the crimes often

committed in the Northeast Area involve gang activity, shootings, and robberies. When making traffic stops, Gariano has arrested people for crimes involving, *inter alia*, gun related offenses with which he has become familiar as a result of his four year assignment. In this case, Gariano confirmed that he received no recent tips or briefings about guns or other crimes in the area where Defendant was stopped.

Upon stopping Defendant, both officers exited the patrol vehicle and Gariano approached Defendant on the driver side of the car. As Gariano approached, Defendant's windows were rolled down and his hands were on the steering wheel evidencing compliance with safety related tasks Gariano typically asks drivers to do before he approaches a vehicle on foot. After introducing himself, Gariano asked Defendant whether Defendant knew why he was stopped. Defendant replied yes—that is, Defendant acknowledged he was driving a vehicle without a license plate. Gariano next asked Defendant if there were any weapons or drugs in his vehicle, to which Defendant replied no. At the evidentiary hearing, Gariano testified that he asks every driver he stops if there are weapons in the vehicle to ensure officer safety. Gariano confirmed this on cross examination. Gariano explained that there is "tension" in every traffic stop, that such stops are "unpredictable," and that he is always cautious when making a traffic stop.[1]

Gariano's body camera confirms he next asked Defendant: "You just bought the car?"; and, Defendant replied "Yes." Gariano followed this question by asking Defendant if he had "ID" on him. Defendant said no, explaining he left his ID at home. When Gariano then asked Defendant if he had ever been arrested,[2] Defendant volunteered that he was on parole and told Gariano it was for being a felon in possession of a firearm. At this point in the stop, Gariano knew that Defendant was driving a vehicle without a license plate, without a driver's license, in a high crime area of Las Vegas, and was on parole for being a felon in possession of a firearm. This last piece of information confirmed that Defendant was at least a twice convicted felon (once for an unknown felony, and a

---

[1]    Defendant did not dispute that traffic stops are unpredictable and dangerous for police officers.
[2]    Gariano explained that when an individual lacks identification, asking about criminal history may assist with confirming identity, which can be difficult as it is not unusual for individuals to give false names or otherwise lie about who they are. This inquiry also allows Gariano to test an individual's honesty.

1  second time for being a felon in possession of a firearm). All of these questions were asked and

2  answered within about 40 seconds of Gariano's first contact with Defendant. Gov't Ex. 1.

3  Significant to this analysis, Gariano agreed with Defense Counsel that "everything changed"

4  when he learned Defendant was on parole from a conviction for being a felon in possession of a

5  firearm. Gariano testified that his concern now was whether Defendant had a gun. Gariano

6  explained that "with firearms its different"; officers want to "be safe"; and "people lie" to law

7  enforcement all the time.

8  Approximately 45 seconds into his initial contact with Defendant, Gariano asked Defendant

9  for his identifying information telling him not to lie about his identity as that is a separate offence.

10  Defendant provided all the information Gariano requested and was compliant throughout this period

11  (and the entire stop) keeping his hands visible at all times. Defendant argues that at this point,

12  LVMPD had everything it needed to confirm Defendant's identity, do a records check, and write a

13  citation, but that the purpose of the stop changed from a traffic investigation to an investigation into

14  a gun crime.

15  After receiving Defendant's identifying information, Gariano asked Defendant a second time

16  "You don't have any weapons on you, right now?" Defendant responded by shaking his head and

17  saying no. Gariano then asked if Defendant was in violation of any "special conditions" of his

18  parole, to which Plaintiff said he was to have no negative contact with police. Gariano responded

19  by telling Defendant that the contact with LVMPD was not a negative contact (explaining on cross

20  examination that this was because it was just a traffic stop). This conversation concluded

21  approximately one minute and thirty seconds after Gariano made his first contact with Defendant.

22  The entirety of these exchanges were cordial and non-threatening. Gariano's tone was always calm

23  and almost friendly with Defendant. Defendant was equally calm and compliant.

24  Gariano next told Defendant to get out of the car so they could "have a conversation."

25  Gariano told Defendant he was not in any trouble. Gariano told Defendant that once he confirmed

26  Defendant did not have a weapon on him "we'll be good to go." Gariano further explained that he

27  asked Defendant to get out of the car to put him at ease, which he tries to do by stating he just wants

28  to have a conversation. But, in this case, Gariano admitted in testimony that he also ordered

1  Defendant out of the car so that his partner, Alvarado, could safely conduct a pat down to ensure

2  Defendant did not have a gun on him (a reason confirmed by Alvarado in his testimony). Gariano

3  testified that, given Defendant was on parole for being a felon in possession of a firearm, and "people

4  reoffend," he was concerned that Defendant might have a gun in his vehicle.[3]

5  Defendant stepped out of the car as asked, with his hands always visible, and walked toward

6  the front of the LVMPD patrol vehicle. Defendant was wearing a red fanny pack across his body as

7  he left the vehicle he was driving. Alvarado, the second LVMPD officer who was then standing by

8  the front of the patrol vehicle, immediately recognized Defendant. Alvarado previously served as a

9  correctional officer at a state prison where Defendant was housed. Alvarado did not recall

10  Defendant's name, but knew his face. Defendant clearly recognized Alvarado. Alvarado and

11  Defendant briefly conversed, smiling as they did so, after which Gariano asked Defendant to take

12  off the fanny pack. As Defendant did so, Gariano touched the unzipped fanny pack, opening and

13  lifting it slightly, as he assisted Defendant.[4]

14  On cross examination, Gariano confirmed that when Defendant was told to get out of his

15  vehicle, Gariano wanted not only to determine if Defendant had a gun, but also to conduct a "further

16  investigation." Gariano testified that the investigation he was conducting at that point was not a

17  traffic infraction, but whether Defendant was a felon in possession of a gun. Gariano admitted that

18  Defendant was not free to leave until he was sure Defendant was not in possession of any weapons.

19  Gariano also admitted that he did not call for backup and that Alvarado did not indicate Defendant

20  was dangerous. Neither officer testified that they had any concern for their personal safety based on

21  Defendant's conduct during the traffic stop as Defendant was always fully cooperative.

22  At approximately two minutes and thirty-five seconds after Gariano made contact with

23  Defendant, Gariano returned to his patrol vehicle to start a criminal background check on Defendant.

24  Gariano did not have the VIN from Defendant's vehicle, had not asked any questions about the

25  vehicle's ownership, and did not check DMV records once in his patrol car. In fact, Gariano

---

26  [3]    While Gariano testified that criminals tend to reoffend, he denied that his mind set was "once a criminal always
27  a criminal." Gariano, whose testimony was always credible, stated that was not his "state of mind." Rather, he was
concerned about whether Defendant might be in possession of a firearm and wanted to ensure everyone's safety.
28  [4]    Alvarado's testimony confirmed that he did not search the fanny pack, but that when he moved the fanny pack
once it was on the hood of the patrol car, it was obvious there is nothing inside.

admitted that he did not return to his car to write a citation and was not investigating whether Defendant was driving a stolen car. Instead, Gariano looked at Defendant's criminal history.

While Gariano ran a criminal history check (which is briefly thwarted by a misspelling of Defendant's name and ultimately took approximately two and one-half minutes), Alvarado did a brief pat down of Defendant, finding no weapons or drugs, while he and Defendant continued a cordial conversation waiting for Gariano to complete the check. Gariano testified that his review of Defendant's criminal history revealed two prior felonies (grand larceny and robbery), which increased his concerns. Gariano also admitted he found no active warrants for Defendant's arrest. A total of approximately five minutes elapsed before the records check was completed. Defendant was not in handcuffs during any of this time.

Gariano's body camera shows that upon completing the records check, Gariano asked Defendant if "there is anything in the car?" to which Defendant said no and that he "just got" the car. Gariano again asked "No guns?," which Defendant confirmed. Gariano testified that although Defendant had not otherwise lied up to this point, and had previously denied having a gun, "people" tend to lie when they are in possession of illegal contraband. Gariano then asked Defendant if it was "cool if we check?" Ex. 1 at 5:40.⁵ Defendant hesitated approximately three seconds and then said, "No man, I just got it from my aunt …." *Id*. at 5:44. No written consent form was given to Defendant.

Gariano then searched Defendant's vehicle while Defendant remained un-handcuffed at the front of the patrol vehicle with Alvarado. Defendant's back was to Gariano throughout the search. Gariano's search lasted less than a minute and resulted in the discovery of a hand gun under the driver seat. This lead Gariano to give Alvarado a signal to handcuff the Defendant, which Alvarado did immediately. *Id*. at 6:44. Defendant states that it is at this point that Defendant was in custody. Recording of November 30, 2020 Evidentiary Hearing at 12:47:13.

During Alvarado's testimony his body camera was played evidencing a casual conversation between Defendant and Alvarado that bordered on friendly. Alvarado explained, however, that he

---

⁵    Gariano stated he always seeks consent to search, rather than doing a protective sweep if even he has a basis to do so.

became concerned when Defendant gave inconsistent responses regarding where he got the vehicle. Alvarado stated that, unlike his original statement confirming he just bought the car, Defendant now stated that he obtained the car from his girlfriend or aunt. However, Alvarado also testified that at no time did Defendant say or do anything that indicated he did not consent to or was not otherwise "okay with" the search of the vehicle. The body camera videos confirm Alvarado's testimony. The body camera also confirms, as did testimony, that Defendant made no furtive movements at any time causing either officer concern.

Alvarado's body camera begins with Defendant in handcuffs and Alvarado administering the *Miranda* warning. However, Alvarado admitted that he did not Mirandize Defendant immediately after he was handcuffed. Before being Mirandized, Defendant asked if he could talk to Alvarado, and stated he did not want to go back to "that place." Defendant asked if Alvarado could just tow the car and allow Defendant to just walk home. After Defendant was Mirandized he made additional incriminating statements.

At no time did Gariano or Alvarado act aggressively or sound threatening when interacting with Defendant; nor did either officer put his hand on or make any motion to pull his service weapon (although the weapons were visible). There is no evidence that race played a role in any decision either LVMPD officer made. In fact, Defense Counsel asked Gariano if he stopped her would he ask if she had any weapons in her car. Gariano said yes. He reiterated he asks *everyone* he stops if they have any weapons in their vehicle.

Defendant was ultimately arrested for being a prohibited person in possession of a firearm under state law. On August 12, 2020, the U.S. Attorney's Office for the District of Nevada sought an indictment under federal law for the same crime. On August 17, 2020, Defendant made his initial appearance and was detained pending trial.

## II.    Discussion

The Court notes that it finds both officers credible. There is no doubt that their accounts of what occurred on July 11, 2020, was accurately reflected in their testimony. There is no dispute that LVMPD's traffic stop of Defendant was lawful; thus, the first questions the Court must answer are

whether the traffic stop was delayed and, if so, whether there was reasonable suspicion for expanding the stop to investigate a separate potential gun crime.

A.    The Law.

A search without a warrant is "presumed to be unreasonable" and therefore a violation of the Fourth Amendment prohibition "against unreasonable search and seizure" unless it satisfies one of the 'specifically established and well-defined exceptions.'" *United States v. Hicks*, Case No. 2:18-cr-00374, 2019 WL 2905047, at *6 (D. Nev. July 5, 2019) (citation omitted).  In 2005, the United States Supreme Court stated: "A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005).  In 2015, the United States Supreme Court issued its decision in *Rodriguez v. U.S.*, 575 U.S. 348 (2015).

The *Rodriguez* decision illuminated the *Caballes* decision by stating that "[a] seizure for a traffic violation justifies a police investigation of that violation." *Id*. at 354.  The "tolerable duration of police inquiries" during a traffic stop depends on the "mission" of the stop—that is, "to address the traffic violation that warranted the stop, . . . and . . . *related safety concerns . . . .*" *Id*. (citations omitted; emphasis added).  As plainly stated by the Court, "[b]ecause addressing the infraction is the purpose of the stop, it may last no longer than is necessary to effectuate that purpose." *Id*. (citations and quote marks omitted).  Authority for the seizure ends "or reasonably should have ended" when the "tasks tied to the traffic infractions … are completed." *Id*. (citations omitted).

The *Rodriguez* Court also recognized that an officer's mission during a traffic stop includes inquiries such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile registration and proof of insurance" because these activities ensure the safe and responsible operation of vehicles on the road. *Id*. at 355.  These are "negligibly burdensome precautions." *Id*. at 357.  However, "[o]n-scene investigation into other crimes, . . . , detours from that [road safety] mission. . . . So too do safety precautions taken in order to facilitate such detours." *Id.* at 355-56 (citations omitted).  Activity that lacks "the same close connection to roadway safety" cannot be fairly "characterized as part of the officer's traffic mission." *Id*. at 356.  "If an officer can complete traffic-based inquiries expeditiously, then that is the amount

of time reasonably required to complete the stop's mission." *Id*. at 357 (citations omitted).  "An officer, in other words, may conduct certain unrelated checks during an otherwise lawful traffic stop.  But . . ., he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id*. at 355.  The Court repeated the admonition that a "seizure remains lawful only 'so long as [unrelated] inquiries do not measurably extend the duration of the stop.'" *Id*. (Internal citation omitted.)  The *Rodriguez* Court expressly rejected the argument that events unrelated to the traffic stop, which occur *before* a ticket is issued, are not unreasonable.  The critical question is not whether the unrelated event "occurs before or after the officer issues a ticket . . . but whether conducting" the unrelated event "prolongs … the stop." *Id*. at 357.

After making a valid traffic stop, officers may broaden their line of questioning if there are particularized and objective factors that give rise to a reasonable suspicion of another crime.  *U.S. v. Garcia-Rivera*, 353 F.3d 788, 791 (9th Cir. 2003) (internal citation omitted).[6]  While events taken in isolation may have a "reasonable explanation, … they may collectively amount to a reasonable suspicion."  *U.S. v. Cotterman*, 709 F.3d 952, 968 (9th Cir. 2013) (internal citation and quote marks omitted).  While "a mere hunch" is insufficient to "create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Kansas v. Glover*, __ U.S. __, 140 S.Ct. 1183, 1187 (2020) (internal citation and quotation marks omitted).

> Because it is a less demanding standard, reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause. … The standard depends on the factual and practical considerations of everyday life on which *reasonable and prudent men*, not legal technicians, act. … Courts cannot reasonably demand scientific certainty … where none exists. … Rather, they must permit officers to make commonsense judgments and inferences about human behavior.

*Id*. at 1188 (internal citations and quote marks omitted) (emphasis in original).

Moreover, the *Kansas* Court stated that "the reasonable suspicion inquiry falls considerably short of  51% accuracy, … for as … [the Court] ha[s] … explained, to be reasonable is not to be

---

6    Furtive movements, knowledge of a prior felony conviction, and an inability to produce a valid driver's license, vehicle registration or proof of insurance were, by way of example, sufficient to support expanding the scope of a traffic stop beyond its original purpose.  *Id*.

perfect." *Id.* (internal citations and quote marks omitted).  An inference on which reasonable suspicion lies need not be "grounded in … law enforcement training or experience." *Id.* at 1189.  In fact, the Supreme Court stated that the Court has "repeatedly recognized the opposite." *Id.* "Removing common sense as a source of evidence … would considerably narrow the daylight between the showing required for probable cause and the less stringent showing required for reasonable suspicion." *Id.* at 1190 (internal citations and quote marks omitted).  Finally, the Supreme Court stated, "officers, like jurors, may rely on probabilities in the reasonable suspicion context." *Id.* (citation omitted).

In 2017, the Ninth Circuit Court of Appeals stated: "If during a traffic stop, new grounds for suspicion of criminal activity continue … to unfold, the period of the detention can be constitutionally extended." *United States v. Pinex*, 720 Fed.Appx. 345, 346 (9th Cir. 2017) (internal citation and quote marks omitted).  And, as facts (the driver gave a false name, social security number, and date of birth while stopped on a highway that "law enforcement officers consider a 'drug corridor'") unfolded, the court found the officers "reasonably suspected" the defendant of drug trafficking, and the traffic stop was not unconstitutionally prolonged.  *Id.* at 347.  Although "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support reasonable, particularized suspicion that a person is committing a crime, … officers are not required to ignore … a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (internal citation omitted).  Further, "[i]n reviewing the propriety of an officer's conduct, courts do not have available empirical studies dealing with inferences drawn from suspicious behavior, and we cannot demand scientific certainty from judges or law enforcement officers where none exists." *Id.* at 124-25.

In 2018, the U.S. District Court for the District of Oregon considered whether a lawful traffic stop evolved into an impermissibly prolonged stop to investigate a drug and weapons crime.  *United States v. Jackson*, 321 F.Supp.3d 1223 (D. Or. 2018).  In *Jackson*, after pulling over the defendant, an officer approached the car, asked the driver, Jackson, if he knew why he was stopped and if he had a driver's license and proof of insurance.  *Id.* at 1226.  At this time, Jackson turned to the center console blocking the officer's view.  *Id.*  The officer nonetheless testified that he saw an object that

appeared to be a weapon.  *Id.*  Jackson told the officer he could not find his wallet, but identified himself as Richard Jackson, which was a name the officer stated he recognized because of law enforcement contacts with a Richard Cody Jackson known to be involved in drug and weapons trafficking.  *Id.*

One minute into the stop, the officer asked Jackson to exit the vehicle and placed him in handcuffs for failing to "carry and present" in violation of state law.  *Id.* at 1227.  The officer did not ask for Jackson's date of birth, for other identifying information or call dispatch to ask if Richard Jackson or Richard Cody Jackson had a valid driver's license.  *Id.*  Jackson asked if he could retrieve his wallet, but the officer refused to allow him to do so because he had seen "some kind of weapon or stick or something."  *Id.*  However, the officer did not do a pat down.  *Id.*  The officer told Jackson he was not under arrest, but not free to go, and then Mirandized Jackson.  The officer offered to "grab" the wallet for Jackson who said he was not sure of its location.  *Id.*  Then, at about 3 minutes into the stop, the officer launched into a series of statements telling Jackson he knew who he was and what he did.  *Id.*  The officer asked Jackson if he had a "little dope on him" and then questioned Jackson for about two additional minutes regarding drugs.  *Id.*  Five minutes into the stop, the officer radioed for back up.  The officer then asked Jackson again if there was "dope" in the car, which Jackson now admitted.  When the second officer arrived a minute after back up was called, the original officer pressed Jackson to tell them where the dope was located.  Eight minutes into the stop, the original officer asked for consent to search Jackson's vehicle.  *Id*. at 1228.  After being told it would be easier if Jackson just told the officer where drugs and a gun was located, Jackson did so, after which the officer did a pat down search.  The search located the gun, drugs, and cash.  *Id.*  Nine minutes into the stop, the original officer radioed dispatch to determine if Jackson had a valid driver's license and also asking dispatch do a criminal history check, but a minute later the officer cancelled the criminal history check stating he already knew Jackson's history.  *Id.*  Approximately eleven minutes into the stop, the original officer called a third officer to report that he had Jackson in custody and asked the third officer if he "wanted to do anything or even give it a shot …."  *Id.*  Approximately 29 minutes into the stop, the original officer placed Jackson in the back of his squad car under arrest.  *Id.*

The court found that while the original traffic stop was lawful, law enforcement "did not have reasonable suspicion to believe that a drug or weapon crime was being (or was about to be) committed until defendant admitted that some dope and a gun were in the car." *Id*. at 1230. The court further concluded that law enforcement "deviated from inquiries reasonably related to investigation of the traffic offense to ask questions that elicited those admissions." *Id*. Recognizing Jackson's name from law enforcement contacts, together with the officer's statements to Jackson, indicated the officer believed Jackson was involved in drug trafficking. *Id*. The court concluded that the officer's hunch lead to questioning Jackson about drugs, resulting in a "pause" in the investigation into the traffic crime "for which he had probable cause to detain defendant …" *Id*. The officer's questions about drugs and guns "were not focused on immediate safety concerns." *Id*. The court found that the officer's "motivation" for getting Jackson out of his vehicle and placing him immediately in handcuffs "was to put defendant in a position where he would be likely to yield to questioning …." *Id*. at 1231. The officer spent more than two minutes questioning Jackson about drugs before backup arrived, appearing to lead the court to find unpersuasive the officer's testimony that he requested backup so that he could safely question Jackson. *Id*. The two minute questioning impermissibly prolonged the traffic stop, "where the officer took a break from investigating the traffic violation to investigate a hunch about other criminal activity." *Id*.

In *U.S. v. Evans*, 786 F.3d 779 (9th Cir. 2015), the court considered whether to suppress evidence found after making a valid traffic stop of a known drug dealer. Following the valid traffic stop, law enforcement ran a records check to confirm Evans had a valid driver's license and no outstanding warrants. *Id*. at 782. Officers also ran an ex-felon check and deployed a K-9 to sniff around the car (all of which took about 24 minutes). *Id*. at 782-784. This police activity, arising from a traffic stop, ultimately led to an indictment for conspiracy to distribute methamphetamines, possession with intent to distribute methamphetamines, and carrying a gun "during and in relation to a drug trafficking crime." *Id*. at 784. On appeal, the Ninth Circuit reviewed the holding in *Rodriguez*. The court found "that … by conducting an ex-felon registration check and a dog sniff, both of which were unrelated to the traffic violation for which" Evans was stopped, law enforcement "prolonged the traffic stop beyond the time reasonably required to complete . . . [the] traffic mission,

and so violated the Fourth Amendment, unless there was independent reasonable suspicion justifying each prolongation." *Id*. at 786 (citations and internal quote marks omitted).

The court explained that the ex-felon check was "wholly unrelated" to the mission of ensuring cars on the road are "operated safely and responsibly." *Id*. Instead, the purpose of this check was to detect "evidence of ordinary criminal wrongdoing." *Id*. (citations and internal quote marks omitted). In fact, the on-scene law enforcement officer testified at the hearing on the motion to suppress that he believed there was "something more than a simple traffic violation" at issue and admitted that the gathering of information "had no relation to the traffic violation or" the driver's whereabouts. *Id*. at 786-87.

The court considered whether law enforcement had an independent reasonable suspicion that justified prolonging the stop. Discussing officer safety, the court in *Evans* found that prolonging the stop, especially after the officer told Evans he would not cite him for the traffic violation, was "inversely related to officer safety." *Id*. at 787. Instead, the law enforcement officer would have been safer had he let Evans go after stating he would not be cited. *Id*. As stated in *Rodriguez*, "[h]ighway and officer safety are interests different in kind from the Government's endeavor to detect crime . . .." 575 U.S. at 357. Repeated in *Evans*, the government's desire to "detect crime in general or drug trafficking in particular, . . . cannot justify prolonging an ordinary traffic stop to conduct a canine narcotics investigation." *Evans*, 786 F.3d at 788 *citing Rodriguez*, 575 U.S. at 357.

B.    <u>Defendant's Lawful Traffic Stop was Impermissibly Converted into a Separate Criminal Investigation for which the Officers Lacked Reasonable Suspicion.</u>

As was true in *U.S. v. Berber-Tinoco*, 510 F.3d 1083, 1087 (9th Cir. 2007), here, the Court must discern from a "mélange of factors" whether the stop in this case was impermissibly prolonged based on an investigation into another potential crime. The Court finds that Officers Gariano and Alvarado lawfully stopped Defendant for driving without a license plate or temporary tag in a high crime area in which Gariano had worked for four years. Upon walking up to Defendant's vehicle and introducing himself, Gariano asked Defendant if he knew why he was stopped. Gariano next asked Defendant if there were drugs or guns in the car. Gariano testified that he does this in all cases

for safety reason, which in July 2020 was not merely reasonable, but supported by the frequency of police officer injuries and deaths that occur during traffic stops.

Consider the 1987 U.S. Supreme Court decision in *Maryland v. Wilson*, 519 U.S. 408, 413 (1997), in which the Supreme Court stated, "Regrettably, traffic stops may be dangerous encounters. In 1994 alone, there were 5,762 officer assaults and 11 officers killed during traffic pursuits and stops." *See also Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977) ("[A]pproximately 30% of police shootings occurred when a police officer approached a suspect seated in an automobile."); *Theney v. City of Los Angeles*, Case No. 15-9602, 2017 WL 10743001, at *7 (C.D. Cal. June 19, 2017) (citing U.S. Department of Justice, 2014 Statistics on Law Enforcement Officers Killed and Assaulted (available at http://ucr.fbi.gov/leoka/2014/home), and stating: "In 2014, 4,022 officers were assaulted during traffic stops, and 9 officers were killed."); *U.S. v. Garcia*, 279 F.Supp.2d 294, 302 n.1 (S.D.N.Y. 2003) (citing Federal Bureau of Investigation, Uniform Crime Reports: Law Enforcement Officers Killed and Assaulted (1999), and stating: "The terrifying truth is that officers face a very real risk of being assaulted with a dangerous weapon each time they stop a vehicle.").

In July of 2020, the Court finds it was without doubt reasonable for Gariano and Alvarado to be concerned about their safety and safety of the community given that the murder of George Floyd on May 25, 2020, at the hands of Minneapolis police officers. ABC News reported on July 22, 2020, that as of July 13, 2020, 32 law enforcement officers were shot to death, marking a 28% increase in felonious officer death over the same period in 2019.[7] The article makes the point that "[i]n the wake of George Floyd's death at the hands of Minneapolis police in late May [2020], tremendous scrutiny was placed on policing with peaceful protests broadly calling for reform. But accompanying that was a rise in an anti-police sentiment that, experts say, manifested itself in attacks on officers, patrol vehicles and precinct stationhouses, leaving cops around the country feeling under siege. … Don Mihalek, a retired senior Secret Service agent and an ABC News contributor, said … 'Any time the anti-police rhetoric heats up, it sends a message that it's open season on law enforcement. …'"[8]

---

[7] https://abcnews.go.com/US/police-officers-killed-surge-28-year-point-civil/story?id=71773495.
[8] *Id.* (Emphasis added.)

Moreover, given that a review of the body camera shows that Gariano's questions regarding guns and weapons in Defendant's car took, in total, at most a few seconds, and that these questions were clearly related to officer safety, the questions did not measurably extend the duration of this traffic stop.  However, this finding does not answer the question of whether Gariano and Alvarado had reasonable suspicion to investigate a gun crime.

Assessing the evidence in a manner most favorable to Defendant,[9] the totality of the information Gariano had available when he admitted his focus changed from a traffic stop to a concern that Defendant was illegally in possession of a gun—a separate crime—included: (1) Defendant was driving a car with no license plate or temporary tag; (2) Defendant was driving this unlicensed car without a driver's license or identification on him; (3) Defendant was driving this vehicle, without a plate, temporary tag, or identification, in a high crime area; and (4) Defendant was on parole from a conviction for being a felon in possession of a firearm.  This information is insufficient to establish a reasonable suspicion that Defendant had or was about to commit a gun crime.  *Jackson*, 321 F.Supp.3d at 1230; *Evans*, 786 F.3d at 786-88.

Gariano and Alvarado testified at the evidentiary hearing to the following particularized and objective facts: (1) upon stopping Defendant, he made no furtive movements; (2) Defendant did not reach under the driver's side seat or toward the center console and did not otherwise move in a manner indicating he was hiding or reaching for something in the car; (3) there was no time during the stop that Defendant acted in a manner that caused either officer concern for his safety; (4) Defendant was not nervous when approached, had his windows rolled down, kept his hands on the steering wheel at all times, and was cooperative throughout the stop; and (5) Defendant was not known to Gariano through prior law enforcement contacts of any kind and Alvarado, who did recognize Defendant, did not indicate he was dangerous.  In addition, Gariano testified that he had not received a tip or recent briefing regarding gun-related activity in the area where Defendant was stopped, and that Defendant did not lie when asked for identifying information (his name, date of birth, and Social Security Number).  The totality of this information and the circumstances

---

[9]    *Burrell v. McIlroy*, 464 F.3d 853, 857 (9th Cir. 2006) (citing *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996)).

surrounding the stop do not support reasonable suspicion that Defendant was illegally in possession of a gun.

Unlike the facts in *Pinex* or *Berber-Tinoco*, at this juncture, the available objective information and reasonable inferences drawn therefrom do not evidence particularized, objective factors supporting a reasonable suspicion that Defendant was engaged in some kind of wrongdoing other than, perhaps, having stolen or being in possession of a stolen vehicle.[10]  Gariano's inferences from the facts, while perhaps more than a "mere hunch," and even recognizing that they did not need to reach 51% accuracy, were insufficient to pause the traffic investigation (in fact, abandon the traffic investigation as admitted by Gariano) to investigate a potential gun crime.

The Court distinguishes the facts and circumstances in this case from: (1) *U.S. v. Simmons*, 118 Fed.Appx. 161, 162-63 (9th Cir. 2004), in which the court found reasonable suspicion for questions about drugs and a pat down search based on the "extremely brief" nature of the stop, which was at night, in a high crime area, after the defendant left a residential area under surveillance for suspected drug activity; (2) *Garcia-Rivera*, 353 F.3d at 789 and 791, in which the Court found the defendant's furtive movements, failure to produce a valid driver's license, vehicle registration or proof of insurance, and statement to officers that he had been convicted of armed robbery justified a pat down for weapons, a records check, and a request for consent to search the defendant's vehicle; and (3) *McIlroy*, 464 F.3d at 857-58, in which the court found reasonable suspicion because the defendant recently confessed to shooting his girlfriend, several informants recently told police the defendant had just returned from California where he had purchased drugs, and one informant told police the defendant kept a gun in the bedroom of his apartment.  The court cited law establishing that law enforcement is permitted to act on the presumption an individual is armed and dangerous "when a drug dealer has shot someone and continues to commit the crime of possessing a firearm. *Id*. at 858 (internal citation omitted).  In contrast to these cases, the case at bar shows there were no furtive movements, the events occurred in daylight, but not in an area in which there was active police surveillance for gun or other crimes, there was no admission by Defendant of involvement in

---

[10]    The totality of this information may support a reasonable suspicion that the car Defendant was driving was stolen; however, Gariano admitted he was never investigating that crime.

recent gun violence, and there were no tips received regarding Defendant's involvement in any recent criminal activity.

Moreover, whereas the facts in this case may not establish as obvious a violation of Defendant's rights as was established in *Evans* or *Jackson*, the facts of which Gariano was aware (even including his later discovery of a prior conviction for robbery and grand larceny) do not support the conclusion that there was a reasonable suspicion that a gun crime was afoot.  *U.S. v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th. Cir. 2000) (internal citation and quote marks omitted). Gariano's sincere belief that those who have previously offended tend to reoffend, coupled with knowledge of Defendant's prior criminal offense (felon in possession of a firearm), do not establish reasonable suspicion sufficient to transform the traffic stop in this case into an investigation of whether Defendant was illegally in possession of a gun.  *Cotterman*, 709 F.3d at 968 (citing *McIlroy*, 464 F.3d at 858 n.3).  The Court recognizes this was not all that Gariano knew.  Still, when the Court adds to the overall picture that Defendant's car lacked any indicia of registration and Defendant could not produce a driver's license or identification, the Court cannot conclude that Gariano made an inference and commonsense judgment that Defendant was illegally in possession of a gun.

If the facts present in this case are sufficient to support reasonable suspicion of a crime justifying the lawful expansion of a traffic stop into a separate criminal investigation, then conceivably every time an individual with a prior gun or drug conviction is stopped for a traffic violation in a high crime area, law enforcement would be free to expand the stop into a separate criminal investigation.  This is contrary to the holding in *Rodriguez* and the reasoning in *Evans*. Something more is required. There must be some fact that provides a nexus between the surrounding circumstances and information available to law enforcement and the development of reasonable suspicion supporting the expanded investigation.  Generalize concern, even what genuine and well intentioned, is not a lawful basis to expand a traffic stop into a gun crime investigation.  *Rodriguez*, 575 U.S. at 355-56; *Evans*, 783 F.3d at 786.  Whether it is furtive movements by a defendant, an officer's observation of all or part of a weapon when an officer approaches a vehicle, a defendant's agitation or lack of cooperation upon reasonable questioning, a recent tip or briefing regarding a recent crime in the area or a defendant lying about his/her name, date of birth and/or Social Security

Number, there must be something more than a high crime area and a criminal history that lawfully supports reasonable suspicion.

Because Defendant's traffic stop was converted into an investigation into a gun crime for which reasonable suspicion was lacking, the stop was unlawfully prolonged.

C.    Officers Lacked Reasonable Suspicion that Defendant was Armed and Dangerous; Therefore, the Pat Down of Defendant was Unlawful.

Once Gariano ordered Defendant out of the car, which he was lawfully permitted to do, the LVMPD officers needed reasonable suspicion that Defendant was armed and dangerous to conduct a pat down search. *United States v. Jacobs*, Case No. 2:18-cr-394, 2019 WL 1861316, at *1 (D. Nev. Apr. 25, 2019 (internal citation omitted); *United States v. Vargas*, Case No. 2:16-cr-334, 2017 WL 1246340, at **6-7 (D. Nev. Mar. 3, 2017) (internal citations omitted). "A lawful frisk does not always flow from a justified stop." *Vargas*, 2017 WL 1246340, at *8 (internal citation omitted). Instead, the frisk "must be analyzed separately" and reasonableness must be "independently determined." *Id.* (citation omitted). The Court explains above that Gariano and Alvarado lacked reasonable suspicion that Defendant was in possession of a gun. Further, the totality of the information available, including, but not limited to, that neither Gariano nor Alvarado testified he had formed a suspicion that Defendant was dangerous, and the body camera evidence confirms Defendant engaged in no conduct to indicate he was dangerous, the Court concludes the pat down of Defendant was also unlawful.

D.    Even Assuming Defendant Voluntarily Consented to Search of His Car, This Search was the Fruit of a Poisonous Tree.[11]

The law supports the search of Defendant's car if the connection between the traffic "stop and the search was so attenuated that the search and the evidence discovered were sufficiently

---

[11]    The Court does not conclude that Defendant's consent was voluntary. To do so requires a thorough analysis of five facts including (1) whether Defendant was in custody (Defendant admits he was not in custody when asked for consent, but Gariano admitted Defendant was not free to leave), (2) whether the officers involved in this case had guns drawn (they were not), (3) whether Defendant was given a *Miranda* warning before he was asked for consent to search (he had not, but he was not, at that time, subject to a custodial interrogation), (4) whether Defendant was told he had a right to not to consent (he was not), and (5) whether Defendant was told a search warrant could be obtained (he was not). *United States v. Soriano*, 361 F.3d 494, 502 (9th Cir. 2004). As also stated in *Washington*, although some factors in this case favor the government, the fact that Defendant was not free to leave the scene create serious question regarding whether his consent was voluntary. 490 F.3d at 776.

1   distinguishable [from the stop] to be purged of the primary taint." *U.S. v. Twilley*, 222 F.3d 1092,

2   1097 (9th Cir. 2000) (internal citation and quote marks omitted); *U.S. v. Washington*, 490 F.3d 765,

3   774 (9th Cir. 2007) (citation omitted).  That is, even assuming there was "[c]onsent to search …

4   [this] does not necessarily … dissipate the taint of a fourth amendment violation." *United States v.*

5   *Chavez–Villarreal*, 3 F.3d 124, 127 (5th Cir. 1993).

6           It is the government's burden "to show that the evidence is not 'the fruit of the poisonous

7   tree.'" *United States v. Patzer*, 277 F.3d 1080, 1086 (9th Cir. 2002).  The government has not argued

8   attenuation.  ECF No. 20.  This, in itself, is a sufficient basis to find the search was not attenuated

9   and, therefore, the discovery of the gun must be suppressed.

10          Moreover, even if an attenuation argument was raised, it fails as there is no evidence to

11  support the conclusion that there was a sufficient break in the chain of events to refute the inference

12  that the search and the resulting discovery of the gun in Defendant's car can be "purged of the taint"

13  arising from the impermissible expansion of the traffic stop into an investigation into a gun crime.

14  *Twilley*, 222 F.3d at 1097 (internal citations omitted).  The request to search arose directly from and

15  was inextricably intertwined with the abandonment of the traffic stop to investigate whether

16  Defendant was illegally in possession of a gun.  The investigation into whether Defendant was

17  illegally in possession of a gun was based on the fact that Defendant was driving in a high crime

18  area, in a car without a license plate or driver's license, and was a felon on parole.  These facts do

19  not create a nexus to the reasonable suspicion that Defendant was illegally in possession of a firearm,

20  which is what prompted the request to search.  *United States v. Chavez-Valenzuela*, 268 F.3d 719,

21  727-28 (9th Cir. 2001), *as amended by* 279 F.3d 1062 (9th Cir. 2002) ("evidence obtained

22  subsequent to an illegal investigation is tainted by the illegality and thus inadmissable,

23  notwithstanding the suspect's consent, unless subsequent events have purged the taint").  Where, as

24  here, the extended investigation was not supported by reasonable suspicion, "fruits of the subsequent

25  search [are] inadmissible." *United States v. Hight*, 127 F.Supp.3d 1126, 1135 (D. Col.  2015).

26

27

28

E.    Assuming the Miranda Warning given Defendant was Timely; however, the Warning Resulted from an Arrest Tied to an Illegal Search of Defendant's Car.

Confessions obtained following an unlawful arrest are to be suppressed "unless the confession was 'an act of free will [sufficient] to purge the primary taint of the unlawful invasion.'" *Kaupp v. Texas*, 538 U.S. 626, 632–33 (2003) (quoting *Wong Sun v. United States*, 371 U.S. 471, 486 (1963)). Hence, even where *Miranda* warnings are given following an unlawful search that leads to an arrest, the prosecution bears the burden of establishing that sufficient time elapsed or "intervening circumstances" took place sufficient to remove the taint of the unlawful search leading to an arrest such that a defendant's confession can be said to have constituted an act of free will. *See Brown v. Illinois*, 422 U.S. 590, 603-04 (1975). *Miranda* warnings do not act as a "cure-all" rendering voluntary confessions obtained after illegal arrests, because such a rule would reduce "the constitutional guarantee against unlawful searches and seizures ... to a form of words." *Id*. at 602–03; *see also United States v. Nora*, 765 F.3d 1049, 1057 (9th Cir. 2014) (defendant's incriminating statements made immediately upon the heels of the unlawful search of his person suppressed as the fruit of the poisonous tree because the government did not meet its burden of showing intervening circumstances or dissipation of the taint); *United States v. Cruz–Roman*, 312 F. Supp.2d 1355, 1366 (W.D. Wash. 2004) ("The defendant's post-warning statements and evidence seized in searches made after "consent to search" was given by Mr. Cruz–Roman must also be suppressed as tainted fruits of an unlawful search and arrest.")

Here, as was true for the search of Defendant's car, the government makes no argument regarding attenuation—intervening circumstances—between the search of Defendant's car and any post-*Miranda* incriminating statements. Thus, the government has waived this argument. However, even if the government had not waived the argument, there is nothing to support the conclusion that intervening circumstances occurred such that the taint of the illegal search was purged. Immediately upon finding the gun in Defendant's car, Gariano gave Alvarado a signal to handcuff him, which Alvarado did. Clearly, at this point Defendant was in custody. While there was a brief lapse before Alvarado Mirandized Defendant, this lapse occurred because Defendant stated he did not want to go back to "that place" and asked if the officers could just let him go and walk home. The *Miranda*

warning then took place and Defendant made additional statements that occurred on the heels of the search unsupported by reasonable suspicion. For this reason, the Court recommends that all statements by Defendant made post-Miranda be suppressed as the fruit of the poisonous tree because the government did not meet its burden of showing intervening circumstances or dissipation of the taint.

**III.     Recommendation**

Based on the foregoing analysis of all facts and the law in this case, the Court recommends Defendant's Motion to Suppress (ECF No. 14) be GRANTED.

Dated this 4th day of December, 2020

ELAYNA J. YOUCHAH
UNITED STATES MAGISTRATE JUDGE